_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

INLAND EMPIRE WATERKEEPER, A PROJECT OF ORANGE
COUNTY COASTKEEPER; ORANGE COUNTY COASTKEEPER,

*Plaintiffs-Appellants*

v.

CORONA CLAY CO.,

*Defendant-Appellee*

_____

**On Appeal from the United States District Court
for the Central District of California**
No. SA CV 18-0333-DOC-DFM

(Hon. David O. Carter, District Court)

_____

**BRIEF OF *AMICUS CURIAE* CALIFORNIA STATE WATER
RESOURCES CONTROL BOARD IN SUPPORT OF PLAINTIFFS-
APPELLANTS**

*Filed With The Consent Of All Parties*

---

XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
Senior Assistant Attorney General
ERIC M. KATZ
Supervising Deputy Attorney General
*CAROL A. Z. BOYD
Deputy Attorney General
State Bar No. 165988
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone: (213) 269-6359
  Fax: (213) 897-2802
  Email:  Carol.Boyd@doj.ca.gov
*Attorneys for the California State Water
Resources Control Board*

# TABLE OF CONTENTS

**Page**

GLOSSARY OF TERMS ........................................................................ 1

INTEREST OF AMICI ........................................................................ 2

STATEMENT OF AUTHORSHIP AND PREPARATION ........................ 4

INTRODUCTION ............................................................................... 4

BACKGROUND ................................................................................. 5

I.      The Clean Water Act ............................................................ 5

II.     California's General Permit for Storm Water Discharges
Associated with Industrial Activities ....................................... 6

       A.       The Permit's Discharge Prohibitions ............................. 8

       B.       The Permit's Non-Discharge Requirements ................... 8

             1.      Storm Water Pollution Prevention Plan .............. 8

             2.      Implementation of Best Management
Practices ............................................................. 9

             3.      Monitoring ......................................................... 9

             4.      Exceedance Response Actions ........................... 10

             5.      Annual Evaluation ............................................. 11

             6.      Annual Reporting Requirements ........................ 12

       C.       Compliance and Enforcement ....................................... 12

RELEVANT PROCEDURAL BACKGROUND ..................................... 14

ARGUMENT .................................................................................... 17

I.      There Is No Requirement that a Citizen Plaintiff Prove a
Discharge to Establish a Violation of the Permit's Non-
Discharge Requirements ........................................................ 17

       A.       The Clean Water Act Expressly Authorizes Citizen
Suits for the Violation of the Permit ............................. 17

i

**TABLE OF CONTENTS**
**(continued)**

Page

B. The U.S. Supreme Court's *Gwaltney* Decision Does Not Require A Discharge Violation for Continuing Subject Matter Jurisdiction ........................ 23

II. The Clean Water Act Authorizes Enforcement for the Violation of an NPDES Permit's Conditions and Limitations ............................................................. 26

III. The Industrial General Permit Authorizes Enforcement for Noncompliance With Its Non-Discharge Conditions ....... 28

CONCLUSION ................................................................ 30

CERTIFICATE OF COMPLIANCE ............................................ 31

ii

**TABLE OF AUTHORITIES**

**Page**

CASES

*Alaska Community Action on Toxics v. Aurora Energy
Services, LLC*
765 F.3d 1169 (9th Cir. 2014) ................................................................. 29

*Coastal Environmental Rights Foundation. v. California
Regional Water Quality Control Board.*
12 Cal.App.5th 178 (2017) ..................................................................... 10

*Commitee to Save Mokelumne River v. East Bay Municipal
Utility District*
13 F.3d 305 (9th Cir. 1993) ..................................................................... 25

*County of Maui v. Hawaii Wildlife Fund*
140 S. Ct. 1462 (2020) ......................................................................... 5, 6

*Ecological Rights Foundation v. Pacific Lumber Company*
230 F.3d 1141 (9th Cir. 2000) ........................................................ *passim*

*Environmental Defense Center, Inc. v. United States
Environmental Protection Agency*
344 F.3d 832 (9th Cir. 2003) .....................................................................7

*Environmental Protection Agency v. California ex rel. State
Water Resources Control Board*
426 U.S. 200 (1976) .............................................................. 5, 6, 17, 27

*Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation,
Inc.*
484 U.S. 49 (1987) ..................................................................... 16, 23, 24

*Headwaters, Inc. v. Talent Irrigation District*
243 F.3d 526 (9th Cir. 2001) ................................................................. 26

*National Wildlife Federation v. Gorsuch*
693 F.2d 156 (D.C. Cir. 1982) ............................................................... 25

*Natural Resources Defense Council, Inc. v. County of Los Angeles*
725 F.3d 1194 (9th Cir. 2013) ......................................................... *passim*

*Natural Resources Defense Council v. Southwest Marine, Inc.*
236 F.3d 985 (9th Cir. 2000) ........................................................... 20, 22

*Northwest Environmental Advocates v. City of Portland*
56 F.3d 979 (9th Cir. 1995) ........................................................ 17, 21, 22

*Pacific Coast Federation of Fishermen's Associations v. Glaser*
945 F.3d 1076 (9th Cir. 2019) ............................................................... 26

*Pronsolino v. Natsri*
291 F.3d 1123 (9th Cir. 2002) ............................................................... 27

*Sierra Club v. Union Oil Company of California*
853 F.2d 667 (9th Cir. 1988) .......................................................... 16, 25

*United States v. Concentrated Phosphate Export Association, Inc.*
393 U.S. 199 (1968) ............................................................................. 24

*United States v. W.T. Grant Co.*
345 U.S. 629 (1953) ............................................................................. 24

**STATUTES**

California Water Code

§ 13000 .................................................................................. 1, 2, 28
§ 13001 ...........................................................................................2
§ 13370 .................................................................................... 2, 6
§ 13377 ...........................................................................................6
§ 13385 .............................................................................. 6, 13, 29
§ 13389 .................................................................................... 2, 6
§ 13399.30 ............................................................................... 6, 13
§ 13399.31 ............................................................................... 6, 13
§ 13399.33 ............................................................................... 6, 13
§ 13399.41 ............................................................................... 6, 13


Clean Water Act, 33 U.S.C

§ 301 ...............................................................................................5
§ 402 ........................................................................................ 5, 7
§ 505 ................................................................................... *passim*
§ 1251 . ...........................................................................................1
§ 1311 .................................................................................. 5, 9, 18
§ 1319 ................................................................................. *passim*
§ 1342 ................................................................................. *passim*
§ 1365 ................................................................................. *passim*

**REGULATIONS**

40 Code of Federal Regulations

§ 122.2 ...........................................................................................9
§ 122.26 ..........................................................................................7
§ 122.41 .............................................................................. 13, 27, 29
§ 122.44 ..........................................................................................9

FEDERAL RULES OF APPELLATE PROCEDURE

Rule 29 ..................................................................................................4

OTHER AUTHORITIES

State Water Board Water Quality Enforcement Policy ............................... 14

State Water Board Enforcement Reports-Citizen Suits ............................... 14

# GLOSSARY OF TERMS

The State Water Board has attempted to minimize the use of acronyms and defined terms, but carries forward the use of acronyms used in Appellants' Opening Brief or otherwise widely used in the industry and prior case law:

| | |
|---|---|
| Act: | Clean Water Act, 33 U.S.C. § 1251 et seq. |
| BMPs: | Best Management Practices |
| EPA: | United States Environmental Protection Agency |
| NPDES: | National Pollutant Discharge Elimination System |
| Porter-Cologne: | California Porter-Cologne Water Quality Control Act, Cal. Water Code § 13000 et seq. |
| Regional Water Boards: | California Regional Water Quality Control Boards |
| State Water Board: | California State Water Resources Control Board |
| SWPPP: | Storm Water Pollution Prevention Plans |
| Water Boards: | State Water Board and Regional Water Boards |

## INTEREST OF AMICI[1]

California's Porter-Cologne Water Quality Control Act (Porter-Cologne) designates the California State Water Resources Control Board (State Water Board) and each of the nine Regional Water Quality Control Boards (Regional Water Board(s)) (collectively, Water Boards) as the principal state agencies with primary responsibility for the coordination and control of water quality in California. Cal. Water Code § 13001. Porter-Cologne authorizes the Water Boards to implement and enforce water quality laws, regulations, policies, and plans to protect the quality of the State's waters from degradation and achieve a unified and effective water quality control program in this State. *Id.* at §§ 13000, 13001. Pursuant to that authority, the State Water Board issued the National Pollution Discharge Elimination System (NPDES) permit at issue in this appeal. *See id.* at §§ 13370-13389.

The State Water Board submits this amicus brief because the district court erred in ruling that a citizen plaintiff cannot enforce a violation of a non-discharge requirement (such as monitoring or reporting) of an NPDES permit unless the plaintiff also proves that the defendant discharged

---

[1] All parties have consented to the filing of this *amicus* brief.

2

pollutants to a jurisdictional water.[2] The ruling is not tethered to the text of the Clean Water Act, is not supported by case law interpreting requirements specific to citizen suit actions, and is inconsistent with the permit itself. If left to stand, the ruling could severely constrain enforcement activities as they apply to regulated storm water discharges associated with industrial activities.

While the district court's ruling was specific to citizen suit plaintiffs and would not apply to an enforcement action taken by the Water Boards, curtailing the scope of citizen suits to exclude actions to enforce non-discharge requirements in the absence of proof of a discharge would frustrate Congress's intent in creating citizen enforcement provisions in the Act and hamstring citizen enforcement that complements the Water Boards' enforcement program. Enforcement of water quality control laws, including through citizen suits, is critical to the success of the State's water quality programs and necessary to ensure that Californians have clean water. Moreover, the district court's ruling would create separate enforcement criteria depending on whether citizen enforcers, the Water Boards, or the United States Environmental Protection Agency (EPA) enforced the permit.

---

[2] The State Water Board expresses no opinion on the remainder of the district court's rulings.

Affirmance of the district court's ruling on this point would weaken the

NPDES storm water permit system in California, curtail enforcement, and

impede the Water Boards' ability to protect the quality of the State's waters.

## STATEMENT OF AUTHORSHIP AND PREPARATION

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate

Procedure, the State Water Board hereby represents: (i) that no party's

counsel authored this *amicus* brief, either in whole or in part; (ii) that no

party or party's counsel contributed money that was intended to fund

preparing or submitting this *amicus* brief; and (iii) that no person—other

than the *amicus curiae*, its members, or its counsel—contributed money that

was intended to fund preparing or submitting this *amicus* brief.

## INTRODUCTION

This appeal arises from a Clean Water Act citizen suit brought by two

non-governmental organizations, Inland Empire Waterkeeper and Orange

County Coastkeeper (collectively, Coastkeeper), against Corona Clay

Company (Corona Clay).  Corona Clay operates an industrial manufacturing

facility in Corona, California.  Coastkeeper alleged (among other claims)

that Corona Clay violated provisions of the State Water Board's NPDES

general storm water permit which required Corona Clay to conduct

monitoring and submit adequate annual reports.  The district court ruled that

4

Coastkeeper could prevail on these claims regarding the permit's non-discharge requirements only if they also proved that Corona Clay had discharged pollutants to a jurisdictional water. That holding was incorrect and should be reversed.

## BACKGROUND

### I.   THE CLEAN WATER ACT

Section 301 of the federal Water Pollution Control Act Amendments of 1972 (Clean Water Act or Act) "forbids 'any addition' of any pollutant from a 'point source' to 'navigable waters' without the appropriate permit from the Environmental Protection Agency[.]" *County of Maui v. Hawaii Wildlife Fund,* 140 S. Ct. 1462, 1468 (2020); *see* 33 U.S.C. § 1311(a). Such "appropriate permit[s]" are issued pursuant to the NPDES permit program under section 402 of the Act. 33 U.S.C. § 1342.

The NPDES permit program is the "linchpin" of the Clean Water Act's regulatory scheme. *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000) (*Pacific Lumber*). NPDES permits "transform generally applicable effluent limitations and other standards … into the obligations (including a timetable for compliance) of the individual discharger[.]" *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976) (*EPA v. California*). The Act's basic purpose is to

regulate pollution at its source. *County of Maui*, 140 S. Ct. at 1473. "Thus, the principal means of enforcing the pollution control and abatement provisions of the [Act] is to enforce compliance with a permit." *EPA v. California*, 426 U.S. at 223.

Subject to EPA approval, states may administer their own NPDES permit programs. 33 U.S.C. § 1342(b). California has obtained this authority. *Natural Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1198 (9th Cir. 2013) (*NRDC*); *see* Cal. Water Code §§ 13370-13389. Under Porter-Cologne, the Water Boards are the principal state agencies responsible for enforcing federal and state water pollution laws and issuing NPDES permits. *See* Cal. Water Code, §§ 13385, 13399.30, 13399.31, 13399.33, 13399.41; *NRDC*, 725 F.3d at 1198-1199. California's NPDES permits incorporate, and ensure compliance with, all applicable Clean Water Act provisions and any more stringent effluent standards or limitations necessary to implement water quality control plans, protect beneficial uses, or prevent nuisance. Cal. Water Code § 13377.

## II. CALIFORNIA'S GENERAL PERMIT FOR STORM WATER DISCHARGES ASSOCIATED WITH INDUSTRIAL ACTIVITIES

Uncontrolled storm water running off industrial sites can cause or contribute to significant violations of water quality standards by loading

heavy metals, pesticides, hydrocarbons, dust, and garbage to downstream

waters.  See *Envtl. Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 840-841 (9th

Cir. 2003).  Storm water discharges associated with industrial activities are

therefore regulated pursuant to Clean Water Act section 402(p).  33 U.S.C.

§ 1342(p); 40 C.F.R. § 122.26.[3]  In 1997, the State Water Board issued a

statewide general permit applicable to all industrial storm water discharges

governed by the Clean Water Act (1997 Permit).  *See* Excerpts of Record

(ER) 01464-71.  The 1997 Permit was superseded in 2015 by State Water

Board Water Quality Order 2014-0057-DWQ, NPDES No. CAS000001

(2015 Permit), except for (1) the 1997 Permit's requirement to submit

annual reports, and (2) for enforcement purposes.  ER00172-379.  The 1997

and 2015 Permits are collectively referred to as either the "Industrial General

Permit" or the "Permit."  In general terms, the Permit contains (1) *discharge*

prohibitions, effluent limitations, and receiving water limitations, all focused

directly on pollutants, and (2) and *non-discharge* requirements, such as

installation of practice-based pollution prevention technologies, as well as

---

[3] "Storm water discharge associated with industrial activity means the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant."  40 C.F.R. § 122.26(b)(13).

7

training, monitoring, and reporting requirements, which are not directly tied to discharges.  Both elements are briefly discussed below.

### A.    The Permit's Discharge Prohibitions

The Permit regulates operators of facilities subject to storm water permitting, i.e., "dischargers," who discharge storm water associated with industrial activities.  It prohibits unauthorized discharges of storm water into waters of the United States.  ER00192-96.

### B.    The Permit's Non-Discharge Requirements

The Industrial General Permit "embodies a range of prophylactic, procedural rules designed to reduce the risk of pollution."  *Pacific Lumber*, 230 F.3d at 1152, n. 12.  This appeal specifically concerns the monitoring and annual reporting non-discharge requirements, but other of the Permit's major non-discharge requirements are summarized below.[4]

### 1.    Storm Water Pollution Prevention Plan

A discharger must develop and implement a site-specific Storm Water Pollution Prevention Plan (SWPPP).  ER00182, 00197-210.  An SWPPP

---

[4] For brevity, this summary does not include non-discharge requirements for training, inactive mining operation certification, compliance groups, conditional exclusion, or special requirements for plastic materials.  ER00196, 00229-32, 00233-39.

8

must include descriptions and assessments of potential pollutant sources, minimum best management practices (BMPs[5]), applicable advanced BMPs, a monitoring implementation plan, and an annual evaluation.  ER00197.

### 2. Implementation of Best Management Practices

Dischargers must use best available technology economically achievable and best conventional pollutant control technology to reduce and prevent discharges of pollutants, and implement BMPs to meet water quality standards.  ER00178, 00194; see also 33 U.S.C. § 1311(b).

### 3. Monitoring

The Industrial General Permit requires dischargers to develop and implement facility-specific monitoring programs.  At a minimum, a discharger must conduct monthly visual observations with sampling and record keeping obligations; conduct specific sampling and analysis, with reporting, for qualifying storm events; and comply with the Permit's monitoring methods.  ER00182-83, 00210-21; *see* 40 C.F.R. § 122.44(i); *NRDC*, 725 F.3d 1207 (NPDES permit unlawful if permittee not required to

---

[5] "BMPs" are "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of 'waters of the United States.'  BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage."  40 CFR § 122.2.

effectively monitor permit compliance); *Coastal Envtl. Rights Found. v. Cal. Regional Water Quality Control Bd.*, 12 Cal.App.5th 178, 182 (2017) (same).

Monitoring data is used to determine (1) whether BMPs addressing pollutants in industrial storm water discharges are effective for compliance with effluent and receiving water limitations; (2) the presence of pollutants in industrial storm water discharges, which may trigger implementation of additional BMPs and/or SWPPP revisions; and (3) the effectiveness of BMPs in reducing or preventing pollutants in industrial storm water discharges. ER00194, 00291-92.

### 4. Exceedance Response Actions

Dischargers must compare the results of their sampling, analysis and reporting to Numeric Action Level (NAL) values to determine if an NAL performance parameter has been exceeded. ER00221-28. When a discharger exceeds an NAL, it must perform an Exceedance Response Action to evaluate whether the facility's BMPs and SWPPP should be revised to prevent future NAL exceedances and/or comply with the Permit's requirements, and respond accordingly. ER00222-23. Further exceedances require the discharger to undertake a Level 2 Exceedance Response Action Plan and Technical Report. ER00223-28.

The purpose of the Exceedance Response Action requirement is to inform dischargers, the public, and the Water Boards of a facility's overall pollution control performance. ER00184. "[Exceedance Response Actions] are designed to assist Dischargers in complying with the General Permit. Dischargers subject to [Exceedance Response Actions] must evaluate the effectiveness of their BMPs being implemented to ensure they are adequate to achieve compliance with this General Permit." ER00184-85.

### 5. Annual Evaluation

Dischargers must conduct annual comprehensive facility compliance evaluations to ensure that all potential pollutant sources are included in the SWPPP and evaluate the effectiveness of their BMPs. ER00317. The evaluation has seven elements: (1) a review of all sampling, visual observations, and inspection records; (2) an inspection of all areas of industrial activity and associated potential pollutant sources for evidence of or the potential for pollutants entering the storm water conveyance system; (3) an inspection of all drainage areas identified as having no exposure to industrial activities and materials; (4) an inspection of equipment needed to implement BMPs; (5) an inspection of any BMPs; (6) a review and effectiveness assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if BMPs are properly

designed, implemented, and effective; and (7) an assessment of any other factors needed to comply with a discharger's annual report.  ER00232.

### 6. Annual Reporting Requirements

Dischargers must submit a certified annual report.  ER00232-33. Reporting under the 1997 Permit required a summary of visual observations and sampling results, an evaluation of visual observation and sampling and analysis results, laboratory reports, an annual comprehensive site compliance evaluation report, an explanation of why a facility did not implement any activities required by the Permit, and various other records. *See* ER00317.  The streamlined 2015 Permit requires dischargers to submit an annual report with a compliance checklist indicating whether the discharger complied with and addressed all applicable Permit requirements; an explanation for any noncompliance within the reporting year; identification of all revisions made to its SWPPP within the reporting year; and the dates of the annual evaluation.  ER00232-33, 00317.

### C. Compliance and Enforcement

Dischargers subject to the Industrial General Permit must comply with *all* of its conditions.  ER00187, 00242.  The Permit explicitly states that noncompliance constitutes a violation of the Clean Water Act and the Water Code and is grounds for an enforcement action and/or removal from Permit

12

coverage.  ER00242; *see* 40 C.F.R. § 122.41(a); *see also* 33 U.S.C. § 1319(a)(1), (3), (b).

While enforcement responsibilities are shared by the Water Boards, the Industrial General Permit is primarily enforced by the Regional Water Boards.[6]  ER00186, 00239-40; *see* Cal. Water Code, §§ 13385, 13399.30, 13399.31, 13399.33, 13399.41; *NRDC*, 725 F.3d at 1198-1199.  Both the Clean Water Act and Porter-Cologne provide for injunctive relief and administrative, civil, and criminal penalties.  See 33 U.S.C. §§ 1319(b) (injunctive relief), (c) (criminal penalties), (d) (civil penalties), (g) (administrative penalties); Cal. Water Code § 13385 (administrative and judicial civil liability), 13387 (criminal liability).

Compliance with the Permit's discharge and non-discharge conditions is critical to protecting public health and the environment, and enforcement is crucial in meeting the Water Boards' mandate to protect the quality of the waters in this state from degradation.  Enforcement helps the Water Boards protect beneficial uses of state waters, prevents threatened pollution from

---

[6] EPA may also enforce the Permit.  *See* 33 U.S.C. § 1319(a)(1), (3) (authorizing administrative and judicial enforcement of EPA compliance orders against persons violating NPDES permit conditions or limitations), (b) (authorizing civil action for violation of administrative compliance order).

occurring, promotes prompt cleanup and correction of existing pollution problems, and has a deterrent effect.  See State Water Board Water Quality Enforcement Policy, Introduction at pp. 1-2 (Oct. 5, 2017).[7]

As a supplement to agency enforcement, section 505 of the Clean Water Act authorizes citizens to bring their own lawsuits.  33 U.S.C. § 1365. Generally, any citizen adversely affected by a Clean Water Act violation may file a civil action against a violator for injunctive relief, civil penalties, and reimbursement of legal costs and attorneys' fees.  *Id.*  The State Water Board has found that citizen suits are an important adjunct to its enforcement actions, and they address violations that the Water Boards do not have the resources to pursue with their own staff.[8]

## RELEVANT PROCEDURAL BACKGROUND

Coastkeeper's operative First Amended Complaint alleged seven causes of action against Corona Clay, only two of which are relevant to this amicus brief: The Sixth Cause of Action alleged Corona Clay's ongoing and continuous failure to develop, implement, and/or revise a monitoring and

---

[7] Available at https://www.waterboards.ca.gov/board_decisions/ adopted_orders/resolutions/2017/040417_9_final%20adopted%20policy. pdf.

[8] *See* State Water Board Enforcement Reports-Citizen Suits, available at https://www.waterboards.ca.gov/water_issues/programs/enforcement/ rpts_citizensuits.shmtl#introduction.

reporting plan.  ER01997-98.  The Seventh Cause of Action alleged Corona

Clay's ongoing and continuous failure to submit accurate and/or sufficient

annual reports.  ER01999-2000.

The jury instructions for the Sixth and Seventh Causes of Action

required Coastkeeper to prove that Corona Clay had discharged pollutants

into waters of the United States *and* violated other non-discharge

requirements of the Permit.  ER00158, 00162.  The special verdict form

contained a "stop here" question, meaning that if the jury found that

Coastkeeper had not proven a discharge, they were to skip all other

questions in the verdict form, including those related to the non-discharge

violations.  ER00381.  Thus, the jury instructions and special verdict form

created an additional element—the discharge of pollutants into jurisdictional

waters—for claims based on non-discharge violations.  The jury did not find

that Corona Clay had discharged and, consequently, did not reach the merits

of the Sixth and Seventh Causes of Action.  *Id.*  Judgment was entered for

Corona Clay on those claims.  ER00004-5.

Coastkeeper moved to alter or amend the judgment on the Sixth and

Seventh Causes of Action on the ground that the district court's decision to

condition non-discharge violations upon proof of an actual discharge, as set

forth in the jury instructions and special verdict form, constituted prejudicial

error. ER00117-47. The district court's order denying the motion provided the following rationale:

> All but one of Plaintiff's arguments turn, essentially, on one purported error of law: that the Court wrongly interpreted and applied *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49 (1987), and its progeny, most notably *Sierra Club v. Union Oil Co.,* 853 F.2d 667 (9th Cir. 1988). Those cases preclude a citizen suit under the Clean Water Act for "wholly past" violations. That is, citizen suits must be predicated on "ongoing permit violations or the reasonable likelihood of continuing future violations." *Sierra Club,* 823 F.2d at 670. The Court, during the process of crafting jury instructions with the parties, interpreted this requirement to mean not just *any* permit violation (such as violations of monitoring and reporting requirements), but specifically *discharge* violations. . . .

ER00009-10. The district court conceded it may have erred, as "it is certainly possible to read *Gwaltney* and *Sierra Club* to encompass not merely discharge violations, but *any* permit violation, as an ongoing violation on which a citizen suit can be based." ER00010. However, the district court stated it was not aware of binding Ninth Circuit precedent that foreclosed its interpretation. "The proper course, the Court finds, would be for the Ninth Circuit to resolve this question on appeal[.]" *Id.*

Coastkeeper's appeal followed, as did Corona Clay's cross appeal of other, unrelated issues.

16

**ARGUMENT**

**I.** **THERE IS NO REQUIREMENT THAT A CITIZEN PLAINTIFF PROVE A DISCHARGE TO ESTABLISH A VIOLATION OF THE PERMIT'S NON-DISCHARGE REQUIREMENTS**

    **A.** **The Clean Water Act Expressly Authorizes Citizen Suits for the Violation of the Permit**

Section 505 of the Clean Water Act authorizes any citizen to bring an action against any person who is alleged to be in violation of "an effluent standard or limitation under" the Act or "an order issued by … a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1). An "effluent standard or limitation" includes "a permit *or condition of a permit* issued under section 1342 … that is in effect under" the Act. *Id.* at § 1365(f)(7) (emphasis added); *EPA v. California*, 426 U.S. at 222-223. Section 505 thus authorizes citizen plaintiffs to enforce *all* permit conditions. *See, e.g.*, *Pacific Lumber Co.*, 230 F.3d at 1151 ("the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural."); *see also Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 968, 987 (9th Cir. 1995) (finding congressional intent to grant broad authority for citizen enforcement).

17

The Industrial General Permit, as a permit in effect under the Clean Water Act, and each of its non-discharge requirements, constitute "effluent standard[s] or limitation[s]" subject to citizen suit enforcement. 33 U.S.C. § 1365(f)(7).

Coastkeeper's Sixth Cause of Action alleged that Corona Clay had violated and continues to violate the Industrial General Permit by failing to develop an adequate monitoring and reporting plan for its facility. ER01997-98; *see* ER00210-21. The Seventh Cause of Action alleged that Corona Clay had violated and continues to violate the Permit by failing to submit accurate annual reports. ER01999-2000; *see* ER00232-33. Coastkeeper thus claimed Corona Clay's ongoing violations of the Industrial General Permit's "effluent standards or limitations."

Against this established precedent— that citizen plaintiffs may enforce the standards set out in NPDES permits, including a "condition of a permit" (33 U.S.C. § 1365(f)(7))—the district court imposed an additional requirement that there be an "unlawful act under subsection (a) of section 1311 of this title," (*id.* at subd. (f)(1)), i.e., a discharge violation. ER00010. Such an "unlawful act" is only one of eight disjunctive definitions of an "effluent standard or limitation" within the meaning of section 505(f). 33 U.S.C. § 1365(f). Any one of those eight classifications, including "a permit

*or condition of a permit* issued under section 1342 of this title that is in effect under this chapter," constitutes an "effluent standard or limitation" that may be enforced by a citizen plaintiff. 33 U.S.C. § 1365(a)(1), (f) (emphasis added).

The district court conceded it may have erred in requiring the violation to be a discharge but nevertheless encouraged review by this Court to state a proposition it found absent from Ninth Circuit precedent—that a citizen plaintiff is authorized to enforce non-discharge violations of the Clean Water Act. ER00010.

This Court has considered the issue:

- In *Pacific Lumber*, the Court addressed claims that the defendant logging company had violated several of the Industrial General Permit's non-discharge requirements. The logging company argued the citizen plaintiffs lacked standing because they failed to demonstrate actual environmental harm. 230 F.3d at 1151. The Court rejected the contention and held that "under many environmental protection statutes, harm to the environment need not ever be proved; the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural." *Id*. The Court further noted that it was "not necessary for a plaintiff challenging violations of rules designed to reduce

the *risk* of pollution to show the presence of *actual* pollution in order to obtain standing." *Id.* at 1152 n. 12.

●　In *Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985 (9th Cir. 2000), the defendant's shipyard operation generated waste and pollutants that were discharged into adjacent waters through, inter alia, storm water runoff.  The defendant had both an individual NPDES waste discharge permit and coverage under the Industrial General Permit. *Id.* at 991.  Both permits required the defendant to develop and implement plans to limit its pollutant discharges through the creation and implementation of BMPs, and the Permit further required the defendant to develop and implement a SWPPP.  *Id.* at 991-992.  NRDC brought a citizen suit enforcement action for numerous violations of the storm water permit's SWPPP standards.  *Id.* at 993.  The district court made several findings, including that the defendant had not made required inspections; had not maintained adequate records of inspections; and that its reports demonstrated a pattern of poor housekeeping and showed that violations, when reported, were not timely remedied.  *Id.* at 993.  The district court concluded that the defendant had violated, and was continuing to violate, non-discharge permit requirements and imposed injunctive relief and civil penalties, which this Court affirmed.  *Id.* at 999-1002.

- In *Northwest Environmental Advocates,* the Court addressed a citizen-suit challenging Portland's operation of a combined sewer system that periodically overflowed and discharged raw sewage into two rivers. 56 F.3d at 981–82. Citizen plaintiffs sued the city for violating an NPDES permit condition prohibiting discharges that violated the state's water quality standards. *Id.* at 985. The city contended that the Clean Water Act did not authorize citizen suits to enforce state water quality standards. *Id.* at 985-86. This Court rejected the argument, holding that "[t]he plain language of CWA § 505 authorizes citizens to enforce all permit conditions." *Id.* at 986. The Court recognized that Congress had broadly authorized citizen enforcement of NPDES permit conditions, including the subject state water-quality standards. Otherwise, "*Portland would have us immunize the entire body of qualitative regulations from an important enforcement tool.*" *Id.* at 987-89 (emphasis added). The Court found substantial support for its conclusion:

> [S]everal courts have held that citizens groups may seek to enforce many kinds of permit conditions besides effluent limitations. In fact, permit conditions that courts commonly enforce under § 505(a) are not effluent limitations, but rather, requirements for retaining records of discharge sampling and for filing reports. … Other examples of enforceable permit conditions include conditions relating to sewage maintenance … and construction schedules[.] … Finally, citizens groups

21

may enforce even valid permit conditions that regulate discharges outside the scope of the Clean Water Act, namely discharges that may never reach navigable waters. . . .

*Id.* at 988-989.

Accordingly, there is Ninth Circuit precedent for the propositions that Clean Water Act citizen suits can be based on purely procedural violations of an NPDES permit (*Pacific Lumber*, 230 F.3d at 1151); that a citizen plaintiff can enforce non-discharge violations of the Industrial General Permit (*Southwest Marine, Inc.*, 236 F.3d at 999-1002); and that the plain language of Clean Water Act section 505 authorizes citizen suits to enforce all NPDES permit conditions (*Northwest Environmental Advocates*, 56 F.3d at 986). The district court's determination that a citizen plaintiff must establish an ongoing discharge violation in order to prove a violation of the Permit's non-discharge conditions effectively immunized Corona Clay from liability for violating an effluent standard or limitation pursuant to 33 U.S.C. § 1365(f)(7). Under the Clean Water Act and apposite Ninth Circuit precedent, the district court's ruling constitutes prejudicial legal error.

**B. The U.S. Supreme Court's *Gwaltney* Decision Does Not Require A Discharge Violation for Continuing Subject Matter Jurisdiction**

The district court relied on *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49 (1987), as the basis for requiring Coastkeeper to prove a discharge as an element of its non-discharge claims. ER00010. But *Gwaltney* does not support that proposition. There, the Supreme Court considered whether the Clean Water Act conferred federal jurisdiction over citizen suits for wholly past violations. *Id.* at 52. The defendant had repeatedly violated its NPDES permit by exceeding its effluent limitations. *Id*. at 49, 53-54. The citizen plaintiffs provided notice of their intent to sue in February 1984; the defendant's last reported violation occurred in May 1984; and the lawsuit was filed in June 1984 upon an allegation that the defendant "'has violated … [and] will continue to violate its NPDES permit.'" *Id.* at 54 (quoting record). The defendant argued that the district court lacked subject matter jurisdiction because its last violation occurred before the suit was filed. *Id.* at 54-55.

The Supreme Court construed section 505 of the Act as requiring citizen plaintiffs to "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney*, 484 U.S. at 57. "[C]itizens, unlike the

23

Administrator, may seek civil penalties only in a suit brought to enjoin or otherwise abate an ongoing violation." *Id.* at 59, 64. Otherwise, section 505's 60-day notice period, 33 U.S.C. § 1365(b)(1)(A), which provides an opportunity for violators to come into compliance and thus render a citizen suit unnecessary, would be "incomprehensible" and "gratuitous." *Gwaltney*, 484 U.S. at 59-60.

The defendant further argued that a citizen plaintiff's allegation of ongoing noncompliance could become false if a defendant becomes compliant. The Supreme Court responded that that circumstance can be addressed under the mootness doctrine when "'"there is no reasonable expectation that the wrong will be repeated."'" *Gwaltney*, 454 U.S. at 66 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). The defendant would have to "demonstrate that it is '*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Gwaltney*, 454 U.S. at 66 (quoting *United States v. Phosphate Export Assn., Inc.*, 393 U.S. 199, 203). And, if the case proceeds to a trial on the merits, the "plaintiff must prove the allegations in order to prevail." *Gwaltney*, 454 U.S. at 66.

Although *Gwaltney* involved discharges, the decision was not predicated on a discharge violation. Rather, the jurisdictional issue decided

24

by the Supreme Court was whether a permittee's violation of an NPDES permit is continuous or intermittent, or wholly in the past. If the latter, then a district court lacks subject matter jurisdiction. *Gwaltney*, 454 U.S. at 57-60; *accord Sierra Club v. Union Oil Co.*, 853 F.2d 667, 669-70 (9th Cir. 1988). Neither *Gwaltney* nor any other case cited by Corona Clay suggests that a citizen plaintiff must prove a discharge as an element of a claim for the violation of an NPDES permit's non-discharge conditions.

To be sure, there is Ninth Circuit precedent for the proposition that to establish a violation of the Clean Water Act's NPDES requirements, "a plaintiff must prove that defendants (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source." *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993) (citing *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156 (D.C. Cir. 1982)). That line of cases is distinguishable because it involves *unpermitted* discharges of pollutants, not violations of non-discharge requirements of NPDES permits. See *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d at 164-165 (whether dam-induced water quality changes caused by impoundment and release of water was a discharge of pollutants subject to NPDES permitting); *Comm. To Save Mokelumne River*, 13 F.3d at 308 (whether operation of dam without NPDES permit constituted discharge of pollutants in violation of

25

Clean Water Act).[9]  Since none of these cases involved a claim of a violation of a non-discharge provision of an NPDES permit, they do not suggest that a discharge is a required element of such a claim.

## II. THE CLEAN WATER ACT AUTHORIZES ENFORCEMENT FOR THE VIOLATION OF AN NPDES PERMIT'S CONDITIONS AND LIMITATIONS

The Clean Water Act does not require a discharge of a pollutant to a jurisdictional water to establish a violation of an NPDES permit.  Rather, as set forth in section 309, the Act's focus is on compliance with *all* permit conditions and limitations, the violation of which may give rise to enforcement.  *See* 33 U.S.C. §§ 1319(a)(1), (3) (authorizing administrative and judicial enforcement of administrative compliance orders issued for violations of state NPDES permit conditions or limitations), (b) (authorizing civil actions for violations of administrative compliance orders); *see also* 1342(b)(1)(C)(i) (requiring state NPDES permit program to terminate or modify permit for the violation of any of its conditions), (7) (requiring state NPDES permit program upon to abate violations of permit or permit

---

[9] *See also Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532 (9th Cir. 2001) (whether irrigation district violated Act by applying aquatic herbicide to canals without NPDES permit); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019) (whether agricultural drainage system discharged pollutants into surrounding waters in violation of Act).

program); *EPA v. California*, 426 U.S. at 223.  In point of fact, federal Clean

Water Act regulations expressly require a permittee to comply with all

conditions of its NPDES permit, with the admonition that "[a]ny permit

noncompliance constitutes a violation of the Clean Water Act and is grounds

for enforcement action; for permit termination, revocation and reissuance, or

modification; or denial of a permit renewal application." 40 C.F.R.

§ 122.41(a).

The United States Supreme Court described this regulatory program as

follows:

> An NPDES permit serves to transform generally applicable effluent limitations and other standards including those based on water quality into the obligations … of the individual discharger, and … provide for direct administrative and judicial enforcement of permits.  [Citations.]  With few exceptions, for enforcement purposes a discharger in compliance with the terms and conditions of an NPDES permit is deemed to be in compliance with those sections of the [Act] on which the permit conditions are based.

*EPA v. California*, 426 U.S. at 205 (citing 33 U.S.C. §§ 1319, 1342(k),

1365).  "Thus, the principal means of enforcing the pollution control and

abatement provisions of the [Act] is to enforce compliance with a permit."

*Id.* at 223; see also *Pronsolino v. Natsri*, 291 F.3d 1123, 1126 (9th Cir.

27

2002) (citing same as basis for proposition that Clean Water Act emphasizes technological controls to target preventable causes of pollution).

This Court's precedent is consistent, instructing that "a permittee violates the CWA when it discharges pollutants in excess of the levels specified in the permit, *or where the permittee otherwise violates the permit's terms*." *NRDC*, 725 F.3d at 1204 (emphasis added); see also *Pacific Lumber*, 230 F.3d at 1151.

There is, therefore, no requirement within the Clean Water Act—or Porter-Cologne—of a discharge to establish a violation of the Industrial General Permit's non-discharge requirements. The proposition is plainly contrary to the statutory enforcement system and the case law interpreting it.

## III. THE INDUSTRIAL GENERAL PERMIT AUTHORIZES ENFORCEMENT FOR NONCOMPLIANCE WITH ITS NON-DISCHARGE CONDITIONS

The Industrial General Permit explicitly mandates compliance with *all* of its conditions. The Permit's face page states that "a Discharger shall comply with the requirements in this Order to meet the provisions contained in Division 7 of the California Water Code (commencing with section 13000) and regulations adopted thereunder, and the provisions of the Clean Water Act and regulations and guidelines adopted thereunder." ER00172. This mandate is stated twice more: "IT IS HEREBY ORDERED that all

28

Dischargers subject to this General Permit shall comply with the following conditions and requirements[,]" ER00187, and "Dischargers shall comply with all standard conditions in this General Permit[,]" ER00242. The Permit further states without ambiguity that "noncompliance constitutes a violation of the Clean Water Act and the Water Code and is grounds for enforcement action and/or removal from General Permit coverage." ER00242; *see* 40 C.F.R. § 122.41(a); *see also* 33 U.S.C. §§ 1319(a)(1), (3), (b); Cal. Water Code § 13385(a).

Courts interpret general NPDES permits as they would a regulation, construing the permit to give effect to the natural and plain meaning of its words. *Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC*, 765 F.3d 1169, 1172 (9th Cir. 2014). Here, the Permit's compliance and enforcement provisions are plainly stated, without exception or ambiguity—*any Permit noncompliance is grounds for enforcement*.

The district court's ruling that a permit violation specifically means a discharge violation effected an impermissible limitation of the Permit's scope. By reading in a qualification that is absent from and contrary to the Permit's plain terms, the district court failed to construe the Permit to give effect to the natural and plain meaning of its words. *Alaska Cmty. Action*, 765 F.3d at 1172.

## CONCLUSION

The State Water Board respectfully urges the Court to reverse the judgment of the district court insofar as it held that a discharge of a pollutant into jurisdictional waters is an element of a Clean Water Act citizen enforcement action for violations of the Industrial General Permit's non-discharge requirements.

Dated:  September 18, 2020        Respectfully submitted,


XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
Senior Assistant Attorney General
ERIC M. KATZ
Supervising Deputy Attorney General

/s/ Carol A.Z. Boyd

CAROL A. Z. BOYD
Deputy Attorney General
*Attorneys for the California State Water Resources Control Board*

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 20-55420, 20-55678

I am the attorney or self-represented party.

No party's counsel authored the brief; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing or submitting the brief.

**This brief contains 5,624 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2, or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party of parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

31

[  ]  is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**  s/ Carol A.Z. Boyd          **Date** September 18, 2020

# CERTIFICATE OF SERVICE

Case Name: Inland Empire Waterkeeper v. Corona Clay Co.  No. 20-55420, 20-55678

I hereby certify that on <u>September 18, 2020,</u> I electronically filed the following documents with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system:

**BRIEF OF *AMICUS CURIAE* CALIFORNIA STATE WATER RESOURCES CONTROL BOARD IN SUPPORT OF PLAINTIFFS-APPELLANTS**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

On <u>September 18, 2020,</u> I served a courtesy copy of the attached **BRIEF OF *AMICUS CURIAE* CALIFORNIA STATE WATER RESOURCES CONTROL BOARD IN SUPPORT OF PLAINTIFFS-APPELLANTS** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Los Angeles, California, addressed as follows:

Honorable David O. Carter
United States District Court-Central District
Ronald Reagan Federal Building and United States Courthouse
411 West Fourth Street,
Courtroom 9 D
Santa Ana, CA, 92701-4516

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 18, 2020,</u> at Los Angeles, California.

|  |  |
|---|---|
| Blanca Cabrera | /s/ Blanca Cabrera |
| Declarant | Signature |

LA2020302221
POS-AMICUS BRIEF.docx